SO ORDERED.

SIGNED this 13th day of January, 2015.





Robert E. Nugent
United States Chief Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARY DONNA POLLAN, | ) | Case No. 13-12513 |
| | ) | Chapter 13 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| SHERI NIELSEN and | ) | |
| JACKIE NIELSEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Adv. No. 13-5204 |
| | ) | |
| MARY DONNA POLLAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Mary Pollan offered Sheri Nielsen a hand up in a time of need; she borrowed money from two banks to buy Sheri a car and fund Sheri's nursing school

1

enrollment while permitting her to live in a rental home Mary owned in Wichita. Sheri was to make the payments on the debts that Mary incurred for her. When Sheri failed to repay her, Mary resorted to self-help to collect from Sheri. After convincing Sheri's mother, Jackie, to refinance the car loan in her own name, Mary reclaimed the (Kia) Soul that she had purchased for Sheri and sold it. Now Sheri and Jackie allege that Mary defrauded them. After they sued her in state court, she filed a chapter 13 case here. Sheri and Jackie filed this dischargeability complaint alleging that Mary's debt to them should be excepted from her discharge because it was incurred by false representations, false pretenses or actual fraud as 11 U.S.C. § 523(a)(2)(A) provides.

To prevail in this proceeding, Sheri and Jackie Nielsen must show that Mary's representations were false when she made them or that she intentionally fostered a false impression to defraud Sheri and Jackie. Merely demonstrating that Mary took property in which Sheri and Jackie claimed an interest is not sufficient to support their fraud-based claims—the only exceptions to her discharge that Sheri and Jackie pled.[1]

Facts

This is the unhappy story of the misplaced affections and misunderstandings that often begin with the best intentions. When Sheri Nielsen met Mary Pollan in 2004, she was a single mother. Mary and her husband (now deceased) ranched in the Cambridge area of southeastern Kansas and Sheri lived nearby with her daughter, America, and her boyfriend, Abel. Until he left Sheri, Abel helped Mr. Pollan with miscellaneous work on the ranch. Mary became attached to Sheri and

---

[1] Plaintiffs Sheri and Jackie Nielsen appeared by their attorney Barry L. Arbuckle of Wichita, Kansas. Defendant and debtor Mary Pollan appeared by her attorney Carl B. Davis of Wichita, Kansas.

America acting almost as a mother and grandmother to them. Sheri's mother Jackie worked at the café in town, helping to support herself and Sheri's father who was ill and on Social Security. Mary frequently cared for America and helped Sheri in various other ways.

By 2011, Sheri wanted to become a nurse so Mary, now widowed, offered Sheri three kinds of material assistance.[2] She offered to borrow money from her bank, the Emerald Bank, on her personal vehicle, and lend it to Sheri to pay for nurses training and some lingering personal debts. She offered to assist Sheri in purchasing a more reliable car (Sheri was driving a junker) so she could safely get to Wichita for school. And, Mary offered Sheri a place to live in her rental house in Wichita. Sheri was a nursing assistant at a nursing home at this time. Even so, she agreed that if Mary would take these loans out, Sheri would carry the payments so that Mary's credit would not be periled.

On July 11, 2011, Sheri and Mary went to the Steven dealership in Wichita to look at cars for Sheri. When they found a suitable vehicle, a used 2010 Kia Soul, they applied for financing as co-makers. But, when the dealer told them that the interest rate would be lower if only Mary were on the note (apparently owing to Sheri's bad credit), Mary alone signed a retail installment contract that Steven assigned to TD Auto Finance and the car was titled to her.[3] This was a 72-month obligation with a $309 monthly payment. Sheri agreed that she would make the payments.

The next day, July 12, Mary signed a note to Emerald Bank for $10,000, secured by a lien on her 1995 Ford Mustang.[4] This note was payable over two years at $456 per month. The loan proceeds were deposited in her checking account and

---

[2] At the time of the events in this proceeding, Sheri was 33-34 years of age.
[3] Ex. C, Ex. D, and Ex. P.
[4] Ex. A.

3

from there, a $2,000 down payment was made on the Kia Soul by check dated July 19, a $1,700 cash withdrawal was made on July 22, and $6,000 was paid for Sheri's nursing school fees by check dated July 20.[5] Mary wrote the $6,000 check, leaving the payee line blank, and gave it to Sheri for nursing school; on the memo line of the check, Mary noted "Loan Sheri."[6] Mary said she left the payee line blank because she didn't know the name of the school; Sheri says Mary actually gave her the check to cash, that she did so at a Bank of America branch, and gave the money back to Mary who took it instead to the casino. Someone wrote the name "Kari Einerson" on the payee line and Ms. Einerson appears to have endorsed the check. Ms. Einerson was an acquaintance of Sheri's and according to Sheri used Bank of America to cash the check (where Einerson banked), because Sheri had no bank account and could not cash the check on her own.[7] Sheri's version lacks credibility not least because Sheri concedes she agreed to repay the Emerald debt and because, as Sheri testified, she was denied admission to nurses training after failing an entrance examination or course prerequisite. Sheri wouldn't have agreed to pay (and, in fact, make payments) if she never received the benefit of the money.

At about the same time, Mary evicted a troublesome tenant from her rental home on Sheridan Street in Wichita and allowed Sheri and America to move in.

---

[5] *See* Ex. I. As the cancelled checks on Mary's bank account demonstrate, she routinely filled out the memo line of her checks identifying the purpose of the check. The $2,000 down payment to Steven Kia (check no. 2100) was dated July 19 and cleared July 21. The $6,000 for nursing school (check no. 2101) was dated July 20 and cleared the bank on July 21. The cash withdrawal was purportedly for unpaid bills and expenses of Sheri (including to repay loans from family members), but she denies receiving the $1,700 withdrawal. Sheri claims that she received a *total* of $2,700 from the $10,000 Emerald loan – the $2,000 car down payment and $700 cash for unspecified bills. In any event, Sheri admitted receiving some amount for bills and expenses from Mary and acknowledged her obligation to make payments on the Emerald loan.

[6] Ex. H.

[7] Sheri's story that she was merely cashing the check for Mary is not believable. Mary's bank account records show that Mary made cash withdrawals in $50-$100 increments fairly regularly (which she personally signed for). *See* Ex. I, J, K. She needed neither to write a check to obtain cash nor Sheri's assistance. If Mary had intended to obtain cash via a check drawn on her account, she could have made the check payable to "cash" and presented it.

4

Sheri was to have free rent for three months, then begin paying $450 rent each month. Mary intended this arrangement to run for at least six months. While it's difficult to understand how Sheri would be able to service $765 each month in debt while paying $450 in rent, a total of $1,215 monthly, on her minimum wage job and while she attended school, that appears to have been Sheri's understanding and Mary's expectation.

Sheri defaulted. She missed the first several Emerald payments. She also missed and was late from the outset on the TD Auto car loan payments, regularly incurring late fees, while she was off work due to a shoulder injury.[8] And, after the free three months expired, she didn't pay the rent on the Sheridan property. Mary addressed this situation by repeatedly asking for the money. When that didn't work, in January of 2012, she took the car briefly as a "wake up call" to Sheri that she expected repayment and in an effort to thwart a possible repossession of the Kia by TD Auto.[9] Not surprisingly, their relationship deteriorated and Sheri stopped communicating with Mary. Sheri called TD Auto to see about taking the car loan on herself, but, because TD Auto apparently thought Sheri was Mary's daughter, they sent the application to Mary's Cambridge address. No application was made.

In April, Mary approached Jackie at Jackie's workplace, the 160 Café in Cambridge. She told Jackie about the two loans and Sheri's default. She told Jackie she wanted them all paid and that she didn't want to hazard her credit rating. She specifically asked Jackie to take on the TD Auto loan by refinancing it at her own bank, Citizens Bank of Kansas. On April 24, 2012, someone representing either Mary or Citizens Bank called TD Auto to get a payoff amount and, on April 30,

---

[8] *See* Ex. F, TD Auto Account History showing a total of 4 loan payments on the TD Auto Loan: October 12, 2011, January 24, 2012, February 6, 2012, and March 13, 2012.
[9] Ex. L. TD Auto sent a notice of default addressed to Mary at the Sheridan property but Mary never received the correspondence because she was not residing at the Sheridan property at the time. Sheri was living there.

5

Jackie closed a loan from Citizens for $17,709, enough to pay off the TD Auto loan in full.[10] Citizens forwarded the funds to TD Auto who, in turn, released its lien against the Kia Soul on May 22.[11] On June 2, the Kansas Department of Revenue issued a clear certificate of title for the Soul to Mary, its record owner.[12]

Between May and September, Mary continued to ask Sheri and Jackie for payment on the Emerald loan. When Sheri stopped taking Mary's calls, Mary wrote her letters, stating in one that she was "sorry I didn't keep the car when I came after it the first time."[13] Mary also approached Jackie at work, resulting in Jackie calling the sheriff to remove her. Meanwhile, Citizens needed to complete its documentation of the Nielsen car loan and, to that end, Citizens requested of Mary to bring the Soul's certificate of title to the bank. Mary brought the title to the Winfield branch office and met with branch president Dennis Knackstedt. She showed him the title, but took it back, saying she wished to consult with a lawyer about how she might best proceed to preserve her rights in connection with the Emerald loan. She then left the bank, never to return. Knackstedt wrote her on September 28 requesting delivery of the title or repayment of what Citizens Bank had advanced to pay off TD Auto.[14]

After receiving the Citizens Bank letter, Mary acted quickly. On October 2, she and friend drove to Wichita and secured a duplicate key to the Soul from the Steven dealership. They then went to Andover, Kansas where Sheri worked, and stopped at the police department to seek assistance in taking the car. When the police declined to assist, Mary and her friend went to Sheri's place of employment and took the car. They returned with it to Steven but, according to Mary, were told

---

[10] Ex. 13, 9.
[11] Ex. F and Ex. G. The TD Auto loan was paid off by Citizens on May 9, 2012 (Ex. F).
[12] Ex. B.
[13] Ex. T.
[14] Ex. 16.

6

the car was in too poor condition for Steven to buy it. In the intervening months between July of 2011 and October of 2012, some 34,000 miles had been put on the car. Sheri's two dogs had ridden in it a lot; the windshield was cracked, and the car was filled with toys, clothes, and trash. Nevertheless, when Mary and her friend went to Carmax, that dealer offered her $8,000.[15] Mary accepted and took the money, signed over her title, and deposited the proceeds in Emerald Bank on October 3 after paying, at least in part, the Emerald note.[16]

Sheri reported the car stolen, but because Mary had legal title to it, the Andover police declined to pursue the complaint. Likewise, Sheri's parents, who had apparently insured the car, made a stolen car claim to Farm Bureau. Like the police, Farm Bureau concluded that Mary's legal title to the car supported her taking it, thus denying the claim.[17] Jackie and Sheri consulted their counsel and sued Mary in Sedgwick County District Court.

The state court litigation has been eventful and expensive. Sheri and Jackie sued not only Mary, but also Carmax, TD Auto, and Citizens Bank on a plethora of theories. A proposed settlement between them and Citizens Bank was never consummated. Carmax was dismissed from the case, as was TD Auto. TD Auto received an award of KAN. STAT. ANN. § 60-211 attorney's fee sanctions against Sheri and Jackie's counsel as part of its dismissal order. Their Kansas Consumer Protection Act claims against Citizens were likewise dismissed and the Bank's "prevailing party" attorneys' fees were also assessed against them. Their motion to reconsider that award was denied and their counsel was sanctioned for his conduct in connection with that matter as well. There are many copied court documents in

---

[15] Ex. E.
[16] Ex. M shows that Mary deposited the $8,000 sale proceeds in her savings account, net of $4,890 applied to the Emerald loan. Mary bagged up the personal property in the car and left it at the back door of the 160 Café for Jackie to return to Sheri.
[17] Ex. N.

7

evidence, but the status of the remainder of the state court case remains unclear. Whatever its status is, all that matters in this adversary proceeding is whether Mary made false representations, employed false pretenses, or committed actual fraud to obtain the Soul or its value and whether Mary's debt to Sheri and Jackie should be excepted from her chapter 13 discharge.[18] Mary filed this chapter 13 case on September 27, 2013. Neither Sheri nor Jackie filed a proof of claim in that case.[19]

Analysis

The plaintiffs' theory of recovery in this case has evolved from a broad-brushed allegation that Mary committed "fraud" under 11 U.S.C. § 1328(a)(2) which incorporates § 523(a)(2)(A), to the more narrow issues presented at trial. In his opening statement, plaintiffs' counsel (who is also their lawyer in state court) claimed his clients relied on Mary's two alleged false statements: (1) that Mary would assist Sheri in buying the Soul and, when Sheri had completed the payments, Mary would sign it over to her; and (2) that if Sheri and Jackie would refinance the car loan, Mary would let them have the car to secure that loan. In addition, counsel stated that Mary's conduct as a whole demonstrated false pretenses. Thus, this case proceeded and will be decided on whether Mary's statements were knowingly false, made with intent to deceive, and justifiably relied upon by Sheri and Jackie to their detriment under § 523(a)(2)(A). Likewise, I will consider whether the plaintiffs proved that Mary's conduct demonstrated false pretenses or actual fraud. Those are the only theories of recovery the plaintiffs pleaded. Exceptions to discharge are narrowly construed in favor of the debtor to promote the "fresh start" policy of the Bankruptcy Code and therefore, where there is doubt it is resolved in the debtor's

---

[18] Nor did Plaintiffs present evidence of the extent of their claimed loss caused by Mary's fraud.
[19] The claims bar date ran on January 28, 2014. Sheri and Jackie are listed on Schedule F as unsecured creditors with unliquidated claims.

favor.[20] The plaintiffs, as creditors, have the burden of proving their alleged exception to discharge by a preponderance of the evidence.[21]

### *False Representation*

A representation is false for § 523(a)(2)(A) purposes if the speaker knows its falsity when she utters it, that she intended to deceive the creditor by uttering it, that the creditor relied on the statement to her detriment, and that the reliance was justifiable.[22] The intent to deceive can be inferred from the totality of the circumstances.[23] Sheri and Jackie allege that Mary made two sets of false statements: first, that while Mary's name would be on the TD Auto financing and the Soul's title, Sheri would own it; and second, that if Jackie and Sheri took out a new loan to refinance Mary's TD Auto car loan, the she would let them have the vehicle as security.

The facts do not support the first alleged false representation. There is simply no evidence that Mary undertook the purchase of the Soul for Sheri's use with the intention of getting someone else to pay for the car or with designs on ultimately keeping it for herself. She already had two cars, the Mustang on which she borrowed from Emerald and a 2010 Ford Fusion. Mary and Sheri shared the understanding that Sheri would complete the payments and eventually receive the vehicle. If Mary formed the intention to mulct Sheri and Jackie into paying for the Soul so she could keep it, she did so after she purchased it from Steven and borrowed the purchase price from TD Auto and after Sheri defaulted on payments. Mary's pre-purchase representation that Sheri would own the car once she'd made the loan payments was not false and was not made with the intent to deceive. There

---

[20] *Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir. 1993); *Herman v. White (In re White),* 519 B.R. 832, 834-35 (Bankr. N.D. Okla. 2014); *In re Coates,* 519 B.R. 842, 848 (Bankr. D. Utah 2014).
[21] *In re White,* 519 B.R. at 835.
[22] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. B.A.P. 2013).
[23] *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. B.A.P. 2010).

9

was no evidence that Mary had no intention of fulfilling her promise to transfer the car to Sheri upon repayment of the loans when the agreement was struck in July of 2011.[24] Only when Sheri breached the agreement by not repaying the loans did Mary's intent change.[25]

The second representation allegation also lacks factual support. The evidence is less than clear whether Mary's conversations with Jackie at the café referred to the Emerald loan. Jackie says Mary said nothing to her about it until after Jackie and Sheri had signed the Citizens Bank note that refinanced the TD loan. Mary says that she did in fact discuss the Emerald note with Jackie because she considered the Emerald loan, the TD Auto loan, and the lease of the Sheridan property a coordinated effort to help Sheri. The plaintiffs' evidence of the second representation is iffy at best. Jackie and Sheri had the burden to prove that Mary made the false statement; I cannot conclude that they met that burden. Rather, given Mary's continuing belief that the loans and lease transaction were elements of one arrangement between her and Sheri, it seems more likely that she would have discussed the Emerald loan with Jackie. Repayment of the Emerald loan (secured by Mary's Ford) was, at least in Mary's mind, a condition precedent to the Nielsens getting the Kia.[26] Mary's subsequent conduct also suggests no misrepresentation was made. The Citizens Bank loan, payoff of TD Auto, and lien release on the Soul occurred in April and May of 2012. Mary took no steps to seize the Soul until October, after Citizens Bank made demand upon her and after months of Mary

---

[24] *See In re Borschow,* 454 B.R. 374, 395 (Bankr. W.D. Tex. 2011) (Mere promise, to be executed in the future, is insufficient to make debt nondischargeable under § 523(a)(2)(A) unless debtor had no intention of fulfilling the promise when made.).

[25] This first representation is not in any event actionable by Jackie as Mary made no representations to Jackie prior to purchase of the Kia. Jackie learned of Mary's 2011 loans to Sheri after the fact.

[26] *In re Bird,* 224 B.R. 622, 627 (Bankr. S.D. Ohio 1998) (If there is room for inference of honest intent, nondischargeability must be resolved in favor of debtor.).

10

asking Sheri and Jackie for repayment of the Emerald Bank loan. Indeed, Mary's correspondence with both Jackie and Sheri in August, evidences Mary's insistence on Sheri's timely payments of the Emerald Bank loan or getting it out of Mary's name so as not to damage her credit.[27] That was the premise of Mary's and Sheri's "deal" from the outset. Had Sheri made the Emerald payments, Mary likely would not have seized the Kia.[28]

### *False Pretenses*

While false representation claims require express statements, false pretense claims involve "implied representations intended to create and foster a false impression."[29] This can include conduct and material omissions. As with the Nielsens' false representation claims, their proof falls short here. They failed to prove that Mary's initial conduct in borrowing money for Sheri to get her a car and help finance her nursing school ambitions was done to create and foster a false impression. The evidence demonstrates that, based largely on their friendship and trust, Mary undertook to help Sheri, and through her, Sheri's daughter, find a way to a better life. Indeed, Sheri testified to her understanding that she would receive the car when she had completed the payments on the TD loan. She also testified that she attempted to keep the Emerald payments current until she was hurt and unable to work. Sheri contacted TD Auto about moving the loan into her own name and asked her mother about it. Sheri also knew that she would be obligated to pay rent on the Wichita house at some point. Sheri and Jackie failed to demonstrate that Mary's conduct or speech "fostered a false impression" at least during the

---

[27] Ex. T, U.
[28] *See also* Ex. 15 – interrogatory answers nos. 10 and 11 indicate Mary's intent and Sheri's promise that she would repay both the Emerald Bank loan and the TD Auto loan before ownership would be transferred to Sheri.
[29] *In re Sturgeon,* 496 B.R. 215, 223.

11

summer 2011.[30]

Whether Mary fostered a false impression in her dealings with Jackie and Citizens Bank is a much closer call. While it is not clear to me that Mary expressly and falsely represented to Jackie that the Nielsens would get the Kia once they refinanced the TD Auto loan, some of her conduct after that time might suggest that she "fostered a false impression" about that. Whether she in her discussions with Jackie made payment of Emerald loan a condition precedent to Sheri and Jackie obtaining the Kia or not, Mary clearly understood that no third bank would likely make a car loan without receiving a lien on the car. Indeed, she had to give Emerald Bank a lien on her Ford to secure the nursing home loan. Mary wanted out from under the TD Auto loan, but she also wanted the Emerald loan repaid. She showed the Kia title to Mr. Knackstedt at Citizens Bank knowing that the TD Auto loan had been paid off, but then refused to sign it over and carried it off. Then, in October of 2012, after Citizens wrote and demanded that either the title be turned over or that Mary take over the loan, Mary and her friend took possession of the Kia and sold it.

In the end, Mary's obligation to TD Auto was repaid by Jackie and Sheri's refinance at Citizens and her liability to Emerald was reduced when she sold the Soul and applied its proceeds to that debt.[31] But the issue in this proceeding was whether that was the outcome she had in mind when she approached Jackie about the TD Auto refinance.[32] The record is simply unclear. Mary saw these transactions as one: she incurred credit that Sheri couldn't have gotten from a legitimate

---

[30] The evidence established that Jackie was not even privy to Mary's and Sheri's dealings until after the car was purchased.
[31] The record is unclear on this point. Ex. M shows that Mary applied $4,890 to the Emerald Bank loan but it is unclear whether this paid off the loan in full.
[32] There was no evidence that Mary had any direct communication with Citizens Bank as to the refinance transaction until after it was consummated.

12

financial institution, credit that Sheri agreed to repay. While a banker or lawyer might understand that retaining the Kia to "secure" Sheri's paying Mary back for the Emerald loan wasn't legally proper, none of these three parties had either the education or training to understand that. That taking the car to pay the Emerald loan made sense to Mary suggests that she lacked requisite wrongful intent.[33] In her mind, even after the TD Auto loan had been repaid, Mary still had a debt to collect and the Kia was the only means to do it, because Sheri had stopped making payments. She took the asset to pay a debt. And as noted under the false representations section herein, Mary continued to pursue Sheri's timely loan payment on the Emerald Bank loan after TD Auto was paid off and before she resorted to the Kia.[34] That is not enough to support a finding of false pretenses here.

### *Actual Fraud*

To prevail on an actual fraud claim, the Nielsens had to show that Mary deliberately engaged in a scheme to deprive them of property or a legal right. As discussed above, they did not prove that Mary had any such plan or motive in mind in July of 2011 when she purchased the Kia. Nor did they show that Mary had a malign plan in mind when she approached Jackie about refinancing the Kia. What appears to have happened here is that Sheri's failure to maintain the payments that Mary generously incurred in her behalf led to hurt feelings and distrust leading her to take matters into her hands. After Mary realized that Sheri and Jackie couldn't or wouldn't repay her for the Emerald loan, she repossessed a car to which she had received clear title, sold it, and paid the Emerald loan herself. The

---

[33] In correspondence to both Jackie and Sheri in August 2012, Mary lamented not keeping the car when she repossessed it the first time. Ex. T, U. This negates the suggestion that she intended all along to keep the car when she first approached Jackie to refinance the TD Auto loan.
[34] *See* Ex. T, U.

13

Case 13-05204    Doc# 55    Filed 01/13/15    Page 13 of 14

Nielsens failed to prove the existence of a scheme to deprive or cheat them. Mary's only "scheme" was to collect from the Nielsens what she felt she was owed and what Sheri had promised to pay.

Conclusion

What transpired in this case is unfortunate at best. Well-intended loans between close friends or relatives frequently go awry when emotions cloud a person's lending judgment. Mary Pollan's judgment was thus clouded. But her conduct in this case is consistent with her belief that Sheri had agreed to repay her for the credit she extended – the TD Auto loan and the Emerald loan. Once Sheri and Mary's communication broke down, Mary collected what she could by repossessing and selling the car titled in her name. While discrete pieces of this transaction show Mary in a negative light, Sheri and Jackie have failed to demonstrate by a preponderance of the evidence that she falsely represented her intentions to them, that she fostered a false impression, or that she made the Kia purchase as part of a scheme to retain the car. Nor does it appear that Mary intended to take the car at the time she approached Jackie about refinancing it. The plaintiffs failed to demonstrate Mary's bad intent; their complaint fails.[35]

Mary is entitled to judgment on the plaintiffs' complaint and judgment will be entered this day accordingly.

###

---

[35] The Court does not condone Mary's self-help initiative and notes that, in a non-bankruptcy setting, Jackie and Sheri *might* be able to show that they had equitable title to the Kia and that Mary converted it when she repossessed and sold the Soul. That was pled in state court, but not here. Conversion can form the basis for a Chapter 7 discharge exception under § 523(a)(6) (willful and malicious damage to property) when the converter is shown to have the requisite malicious intention. That exception is not incorporated as one of the exceptions to a chapter 13 full payment discharge under §1328(a)(2).

14